UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
WILLIAM CABAN,

                              Plaintiff,

                                                                    <u>Memorandum & Order</u>
            -against-                                               10-CV-00389 (SMG)

EMPLOYEES SECURITY FUND OF THE
ELECTRICAL PRODUCTS INDUSTRIES
PENSION PLAN and THE PENSION TRUST
FUND OF THE PENSION, HOSPITALIZATION
AND BENEFIT PLAN OF THE ELECTRICAL
INDUSTRY

                              Defendants.
------------------------------------------------------------X
GOLD, S., U.S.M.J.:

# INTRODUCTION

Plaintiff William Caban worked as an electrician for several years before he sustained a

disabling injury in 2005.  Caban has been awarded a disability pension from a fund administered

by the Joint Industry Board of the Electrical Industry.  Caban brings this action pursuant to

ERISA, 29 U.S.C. § 1132, claiming that he is entitled to a larger monthly pension than he was

awarded and that the pension was payable at an earlier date than it commenced.  The first

amended complaint, the operative pleading, asserts two causes of action: one for recovery of plan

benefits and a second for attorney's fees and costs.  Docket Entry 12.

Defendants, Employees Security Fund of the Electrical Products Industries Pension Plan

("ESF") and the Pension Trust Fund of the Pension, Hospitalization and Benefit Plan of the

Electrical Industry ("PTF"), have moved for summary judgment and ask that the court uphold

the Trustees' decision that Caban is entitled to a monthly disability pension benefit of $490.65

under the PTF Plan, payable beginning September 2010.  Docket Entry 38; *see* Defs. Mem.,

Docket Entry 40, at 1.  Caban has cross-moved for summary judgment, arguing that his monthly

benefit should be $2000 (or, alternately, at least $1152) payable as of the date of his injury in 2005. Pl. Mem., Docket Entry 43, at 35 *et seq.*, 55.

For the reasons stated below, defendants' motion for summary judgment is granted with respect to Caban's disability pension start date and defendants' contention that Caban's pension amount should be calculated based upon his employment as an "M" journeyperson. Plaintiff's cross-motion for summary judgment is denied. However, for the reasons discussed below, plaintiff may attempt to demonstrate in an additional submission that there is a genuine question of material fact with respect to the number of pension credits Caban earned during his employment as an electrician and when he earned them.

## FACTUAL BACKGROUND

The following facts are drawn primarily from the parties' statements of material facts submitted pursuant to Local Civil Rule 56.1, and are essentially undisputed unless otherwise noted. *See* Defs. R. 56.1, Docket Entry 38-1; Pl. R. 56.1, Docket Entry 43-4.

Plaintiff Caban is a trained electrical worker and member of Local 3 of the International Brotherhood of Electrical Workers ("Local 3"). Pl. R. 56.1 ¶¶ 6-7. Throughout his tenure, Local 3 referred Caban to jobs of varying duration and pay in the manufacturing division. *Id.* ¶¶ 7, 10. Many of Caban's employers contributed to one of two different pension plans: the ESF Plan or the PTF Plan. Defs. R. 56.1 ¶¶ 1-2, 4. These plans are funded by employer contributions pursuant to collective bargaining agreements between employers in the electrical industry and Local 3. Defs. Mem. at 2; Declaration of Mark Chanzis ("Chanzis Decl."), Docket Entry 39, ¶ 2. The Joint Industry Board of the Electrical Industry ("Joint Board") administers both plans, though each plan has different contributing employers and is governed by different collective bargaining agreements. *Id.* ¶ 3. The PTF Plan, under which Caban was ultimately

awarded a disability pension, grants the Trustees "full discretionary authority to determine the eligibility for benefits and to construe the Plan's terms and provisions." Defs. R. 56.1 ¶ 14; Chanzis Decl. ¶ 18; Defs. Ex. F at 40, Docket Entry 39-1 at 61 of 143.

On June 24, 2005, while working for QNCC Electric Inc., Caban fell approximately forty feet from a ladder and sustained serious injuries. Pl. R. 56.1 ¶¶ 15-17. As a result of these injuries, Caban applied for and was awarded Social Security disability benefits. *Id.* ¶¶ 19, 32-33. Caban also sought and obtained approximately $400 per week ($1733.33 per month) in workers' compensation benefits, which he received from about the date of his accident through August 2010. Defs. R. 56.1 ¶ 28; Pl. Ex. C; Defs. Ex. E at 1. In addition, Caban brought a personal injury lawsuit. That lawsuit was settled in August 2010. A portion of the settlement proceeds – $75,000 – was paid to the workers' compensation insurance carrier to satisfy its lien under New York Workers' Compensation Law Section 29, and Caban's workers' compensation benefits were terminated at that time. Defs. R. 56.1 ¶¶ 29-30.

Caban also applied for the disability pension at issue in this lawsuit. Before submitting a formal application, Caban wrote a letter to the Joint Board on March 28, 2006 seeking information about his employment history. Pl. Ex. E, Docket Entry 43-6; Affidavit of William Caban ("Caban Decl."), Docket Entry 43-1, ¶ 17. The administrator for the Joint Board, Marsha Collock, replied on April 3, listing plaintiff's employers and approximate dates of employment from 2003 through 2005 and adding, "The Joint Industry Board does not maintain compensation or disability records. These records must be obtained from the Electrical Employees Self Insurance Safety Plan located on the 2nd floor at the above referenced address." Pl. Ex. F; Caban Decl. ¶ 18. Ms. Collock followed up on May 26, 2006 and informed Caban, "[r]ecords at this office indicate that you have been employed by contributing employers" for sixteen years and

one month.  Pl. Ex. G; Caban Decl. ¶¶ 22-23.

By May 2007, Caban had hired an attorney to assist him with applying for a disability pension.  Pl. R. 56.1 ¶¶ 35, 37.  Caban's counsel received a letter from Ms. Collock dated May 24, 2007, indicating as follows:

> Since the Joint Industry Board merely refers members of Local Union No. 3 IBEW for employment, we cannot supply W-2 forms, etc.  However, we are listing below Mr. Caban's employers and approximate employment dates . . . . Information pertaining to wages, attendance, payroll records and employment information must be obtained from the participant's employer.

Pl. Ex. H.  In this letter, Collock listed employers and dates employed extending back to 1998. According to Caban, however, the letter "failed to include all the employers [plaintiff] worked for over [his] 20 plus years as an electrical worker and a member of Local 3 and as a participant in the pension plans."  Caban Decl. ¶ 27.

By letter dated June 5, 2007, Caban explicitly applied for a disability pension.  Pl. Ex. I; Pl. R. 56.1 ¶¶ 42-3; *see also* Defs. Mem. at 4.  Three business days later, Collock replied that Caban's application had been denied because he had only sixteen pension credits and not the twenty credits required by the ESF Plan.  Pl. Ex. K; Pl. R. 56.1 ¶¶ 44-45, 49.  Collock's letter advised Caban that he could appeal the Joint Board's decision to the ESF Board of Trustees. Pl. R. 56.1 ¶ 49.

Caban appealed to the Board of Trustees by submitting a letter dated June 27, 2007. Pl. Ex. M.  On August 20, 2009, Mark Chanzis, Director of Administration for the Joint Board, notified Caban that his appeal seeking a disability pension under the ESF Plan was denied on the grounds that the Plan required at least twenty pension credits for eligibility and that Caban had only ten credits under the ESF Plan.  Pl. R. 56.1 ¶¶ 64-65; *see* Defs. Mem. at 3; Chanzis Decl. ¶¶ 1, 7.  In 2009, Chanzis also believed Caban was not eligible for a PTF pension because

he had not earned ten consecutive credits with a PTF contributing employer. Chanzis Decl. ¶ 8.

Caban filed his complaint commencing this action on January 29, 2010. Docket Entry 1 ("Compl."). On March 8, 2010, the Joint Board reexamined Caban's employment records and determined that Caban's ten pension credits under the ESF Plan and six pension credits under the PTF Plan rendered him eligible for a disability pension under the PTF Plan. Def. Ex. A, Docket Entry 39-1; Defs. R. 56.1 ¶ 5; Chanzis Decl. ¶ 5; Defs. Mem. at 4. The Joint Board reached this decision by applying the terms of a Reciprocal Agreement between the ESF and PTF Plans that combines service under both for vesting purposes, with each pension credit valued according to the rules of the plan under which the credit was earned. Chanzis Decl. ¶¶ 6, 11; Defs. Ex. B. Upon application of the Reciprocal Agreement, the Board concluded that, while Caban was ineligible for an ESF pension, he was eligible for a disability pension under the PTF Plan. Defs. Mem. at 3-4.

The PTF Plan notified Caban on February 29, 2012 that he was eligible for a disability pension in the amount of $563.85 starting July 1, 2007 (the first of the month following the Joint Board's receipt of his application). Defs. Ex. C; Defs. R. 56.1 ¶¶ 10, 26; PTF Plan § 5.15(a).[1] The notification also advised Caban, however, that his disability pension would be offset by the amount of his workers' compensation benefit and that, because Caban had received a monthly workers' compensation benefit greater than the amount of his pension benefit through August 2010, his pension would not be payable until September 2010. Defs. Ex. C; Defs. R. 56.1 ¶ 27; PTF Plan § 4.04. The Joint Board later discovered a clerical error that it determined reduced Caban's monthly pension benefit to $490.65. Chanzis Decl. ¶¶ 13, 28.

Defendants calculated plaintiff's pension amount based upon Caban's status as an "M" journeyperson, earning $24.80 per hour. Chanzis Decl. ¶ 22; Defs. R. 56.1 ¶¶ 18-19. Caban

---

[1] The PTF Plan is set forth in full in Defendants' Exhibit F.

contends that he had from time to time worked at the rate of an "A" journeyperson and earned an accordingly higher salary. Caban Decl. ¶ 58; Pl. Response to Defs. R. 56.1 ¶ 18; Pl. Ex. GG at 11-13.

Defendants outline their calculations in their motion papers. Defs. Ex. G. Defendants also explain that some of Caban's pension credits are valued under the PTF Plan and some under the ESF Plan, and that the computation of his pension is affected by his breaks in service. Defs. R. 56.1 ¶ 22. Caban challenges the amount of his pension benefit, arguing that defendants' calculations were never explained to him as required by ERISA and that he has worked for more employers than the Joint Board has considered. Pl. Response to Defs. R. 56.1 ¶ 17.

On May 24, 2012, Caban's counsel appealed to the PTF Board of Trustees, challenging both the monthly amount of Caban's pension and its September 2010 commencement date. Defs. R. 56.1 ¶ 12; Chanzis Decl. ¶ 14. The Joint Board denied Caban's appeal on July 24, 2012. Defs. Ex. E; Chanzis Decl. ¶ 16; Defs. R. 56.1 ¶ 13.

**DISCUSSION**

## I. *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991). "The court 'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable

inferences in favor of that party, and to eschew credibility assessments.'" *Perlman v. Fid. Brokerage Servs. LLC*, 932 F.Supp.2d 397, 406 (E.D.N.Y. 2013) (citing *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004)).

In reaching a summary judgment determination, a court must resolve ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Coach Leatherware Co. v. AnnTaylor, Inc*., 933 F.2d 162, 167 (2d Cir. 1991). The moving party bears the initial burden of establishing that there are no genuine issues of material fact; if the movant meets that burden, the non-moving party may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *Anderson*, 477 U.S. at 256; *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996). Mere conclusory allegations are insufficient, and "[t]here must be more than a 'scintilla of evidence'" to defeat a motion for summary judgment. *Del. & Hudson Ry. Co. v. Consol. Rail Corp*., 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252).

The same standard applies to cross-motions for summary judgment. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *Parker Hannifin Corp. v. N. Sound Properties*, 2013 WL 1932109, at *6 (S.D.N.Y. May 8, 2013) ("[W]hen cross motions for summary judgment are made, the standard is the same as that for individual motions."). The court should consider "each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *United Indus. Corp. v. IFTE plc*, 293 F. Supp. 2d 296, 299 (S.D.N.Y. 2003) (citing *Morales*, 249 F. 3d at 121).

## II.     Standard of Review of Plan Administrator's Determination

In ERISA actions, the summary judgment standard is "viewed in conjunction with the standard of review of administrative actions under the ERISA guidelines." *Diagnostic Med. Associates, M.D., P.C. v. Guardian Life Ins. Co. of Am.*, 157 F. Supp. 2d 292, 297

(S.D.N.Y. 2001). The standard of review for an administrator's interpretation of an ERISA benefit plan is that "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). When the "written plan documents confer upon a plan administrator the discretionary authority to determine eligibility," the court does not engage in *de novo* review but instead limits its inquiry to whether the administrator's decision was "arbitrary and capricious." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995); *see Tocker v. Philip Morris Companies, Inc.*, 470 F.3d 481, 487 (2d Cir. 2006).

Review under the arbitrary and capricious standard is "deferential" and permits a court to overturn an administrator's decision only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan*, 52 F.3d at 442. Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and . . . requires more than a scintilla but less than a preponderance." *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (internal quotations omitted). Where a plan administrator and a claimant "offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be allowed to control." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008). However, "where the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious." *Id.* at 133.

The deferential arbitrary and capricious standard of review is tailored, however, in cases "where the administrator has a conflict of interest because it has both the discretionary authority

to determine the validity of the employee's claim and pays the benefits under the policy." *McCauley*, 551 F. 3d at 128. In these instances, the "conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (quoting *Firestone*, 489 U.S. at 103). If there is a "showing that the conflict affected the choice of a reasonable interpretation, the court interprets the plan *de novo*." *McCauley*, 551 F.3d at 131 (internal references omitted).

On the other hand, though, "a possible conflict of interest would not alter the standard of review where the plaintiff 'fails to explain how such an alleged conflict affected the reasonableness of the [administrator's] decision.'" *Id.* at 130 (citing *Pagan*, 52 F.3d at 443). Thus, "in the absence of something more," when the "only evidence of a conflict of interest is that an insurer acts as both adjudicator and payor of claims," the arbitrary and capricious standard of review still applies. *McCauley*, 551 F.3d at 130-31 (citing *Pulvers v. First UNUM Life Insurance Co.*, 210 F.3d 89, 92 (2d Cir. 2000)).

To decide whether a conflict of interest influenced the reasonableness of an administrator's decision, courts consider the relevant documentary record. In *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009), the court examined "two documents in the record which [plaintiff alleged] show[ed] that [the defendant] was influenced by its conflict of interest." Plaintiff in *Hobson* attempted to show this influence by pointing to an "email from one . . . employee [of the company where plaintiff worked] to another stating that [defendant, the plan administrator,] 'is requesting a very detailed job description' . . . and 'is trying to cover all basis [sic] for denying the . . . claim.'" *Id.* The court declined to rely on the email, observing that it was from a third party who was not employed by the defendant plan administrator, and that other evidence was inconsistent with the inference of conflict plaintiff sought to draw from the email.

The second document was a note in plaintiff's file written by a nurse who was employed by the defendant, recommending that the defendant obtain updated medical information because the plaintiff's affliction was a "wax and wane type of illness/disease" and would likely not result in a finding of total disability. *Id.* Again, the court failed to find a conflict based on the note, reasoning that "the note simply reflects the reviewing nurse's reasonable doubts," and concluding that it was "not persuaded that these documents show that [defendant's] conflict of interest as evaluator and payor of benefits influenced its reasonable interpretation of [plaintiff's] claim for benefits." *Id.* Thus, the court "decline[d] to afford [defendant's] conflict of interest any weight in [its] review of [plaintiff's] benefit denial." *Id.*

In addition to documentary evidence in the administrative record, courts considering whether a conflict has been shown evaluate whether "circumstances suggest a higher likelihood that [the conflict of interest] affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *McCauley*, 551 F.3d at 133 (internal quotations omitted). In instances where an administrator has a biased history,

> the conflict of interest should prove more important (perhaps of great importance) . . . . It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id.* (internal references omitted).

As pointed out above, Section 6.05 of the PTF Plan provides that "[t]he Trustees shall have full discretionary authority to determine the eligibility for benefits and to construe the Plan's terms and provisions." Defs. R. 56.1 ¶ 14; Chanzis Decl. ¶ 18. Therefore, this Court's review of the plan administrator's determination must be conducted with deference and disturbed

only for abuse of discretion, absent a showing by plaintiff that a conflict of interest affected the reasonableness of the administrators' decisions.

Plaintiff argues in his motion papers that, as both "the determiner of Mr. Caban's pension and the payer of his pension," the administrator of the PTF fund labored under a conflict of interest. Pl. Mem. at 51. Apart from conclusory assertions, however, he identifies little evidence indicating that a conflict influenced the administrator's decision. Plaintiff does cite to

> Ms. Collock's letters indicating that Caban had to identify his own work history, . . . her misstatements about the standard for a pension under the PTF [Plan], . . . the alleged missing letter of appeal, . . . the failure of the Joint Board in notifying Mr[.] Caban that he was eligible to file for a PTF pension . . . [and] Mr. Chanzis "realizing," after the lawsuit was filed, that Mr. Caban was entitled to a PTF pension.

Pl. Mem. at 52. These errors may be evidence of inefficiencies and a lack of attention to detail in defendants' decision-making process. However, while plaintiff may have received inconsistent information after substantial delay, he offers no evidence that these missteps reflect a self-interested institutional motive to deny him benefits; indeed, some of the changes in defendants' position, such as the decision to combine Caban's ESF and PTF pension credits pursuant to the Reciprocal Agreement, benefitted Caban.

Plaintiff argues that defendants' decision to reduce the amount of plaintiff's pension is further evidence of a conflict. Defendants first concluded that Caban was entitled to a pension in the amount of $563.85 but later reduced the amount awarded to $490.65. Chanzis Decl. ¶¶ 13, 28. Although this might suggest the defendants were highly motivated to pay the least amount possible to plan participants, plaintiff fails to raise a meaningful challenge to the calculations that led defendants to award a lower pension amount. *See* Chanzis Decl. ¶¶ 19-26; Defs. Mem. at 14-17. While Caban of course does challenge some of the underlying data and analysis used by the Board to calculate both the $563.85 and $490.65 benefit amounts and not award him a larger

disability pension, he nowhere challenges the accuracy of the calculations or underlying

assumptions that led defendants to reduce his monthly benefit from the higher amount to the

lower one. There is as a result no basis to conclude that the reduction in Caban's benefit amount

resulted from anything other than the discovery of an innocent arithmetic error, and therefore no

grounds to believe that it was prompted by self-interest. Thus, I conclude that the Board's

recalculation is not evidence of a conflict of interest, and that plaintiff has failed to demonstrate

that a "conflict affected the reasonableness of the [administrator's] decision." *McCauley*, 551

F.3d at 131.

In further support of his argument that the alleged conflict of interest should result in *de

novo* review, plaintiff argues that defendants have a documented history of biased claims

administration. Pl. Mem. at 53, fn 7. Indeed, at least one court has criticized the PTF Plan not

only for having "a defective system" which it failed to "retool" but also for failing to "conduct a

full and fair review . . . and to make a decision that was neither arbitrary nor capricious."

*Neely v. Pension Trust Fund of the Pension, Hospitalization & Benefit Plan of the Elec. Indus.*,

2004 WL 2851792 at *13 (E.D.N.Y. Dec. 8, 2004). In *Neeley*, the PTF Plan awarded a plaintiff

a disability pension, but the award was subject to reevaluation in a year. *Id.* at *2. When a

doctor evaluated the plaintiff and concluded she was not so disabled that she was unable to

secure gainful employment, the plan administrators terminated her disability pension. *Id.* The

plaintiff appealed, submitting additional materials and medical reports, but her appeal was

denied. *Id.* at *3. The court concluded that plan administrators "failed to give the same

consideration to her position that it gave to the recommendations of the doctors selected by the

Plan to examine [the plaintiff]." *Id.* at *11. The court did not, however, point to any evidence

that suggested a conflict of interest influenced the reasonableness of the administrators' decision-

making; rather, the court applied an abuse of discretion standard and held that the plan administrators acted arbitrarily and capriciously.

The finding that the PTF Plan acted arbitrarily and capriciously in *Neeley* is not sufficient to show that a history of bias and a conflict of interest influenced its decision in this case. Plaintiff offers no link between the alleged conflict and the administrators' decision-making process and, even if he had, it would be only one factor to weigh in the analysis. *Glenn*, 554 U.S. at 111. Plaintiff has not presented enough evidence to warrant *de novo* review. Therefore, I review the decisions of the plan administrator to determine whether they were arbitrary and capricious.

### III.    Impact of Workers' Compensation Offset on Pension Start Date

Although Caban applied for a disability pension beforehand, defendants determined that his monthly disability pension payments would not commence until September 1, 2010, after his workers' compensation benefits had been terminated. Defendants assert that the PTF Plan provisions in effect at the relevant time provide that any workers' compensation insurance payments must be set off against an employee's disability pension. Plaintiff contends that, because the workers' compensation carrier's lien was satisfied from the proceeds of the settlement of plaintiff's personal injury action, the set-off should not apply, and his disability pension should run from an earlier date.[2]

Caban began receiving payments of $400 per week from the Joint Board-administered

---

[2] The parties also dispute the date on which plaintiff would have been entitled to begin receiving his disability pension if he had not been receiving workers' compensation. More specifically, defendants contend that Section 5.15 of the PTF Plan dictates that disability pension benefits start on the first of the month following an employee's application, and that plaintiff submitted his application in June 2007. Defs. Mem. at 17 (providing that "a pension shall first be payable on the first of the month following termination of employment or receipt of application, whichever is later, unless the Committee finds that failure to make timely application was due to extenuating circumstances"). Plaintiff contends that he confronted extenuating circumstances and that his pension was properly payable on an earlier date. Because I conclude that defendants properly determined that plaintiff was not entitled to receive his disability pension while he was collecting workers' compensation, I do not address the question of when the pension would have been payable if plaintiff had not been receiving workers' compensation.

Electrical Employers Self-Insurance Safety Plan ("EESISP") in July 2005, shortly after his injury, and continued to receive payments through August 2010, when he settled his personal injury lawsuit. Defs. R. 56.1 ¶ 28; Pl. Ex. C. The New York State Workers' Compensation Law provides that an "insurance carrier liable for the payment of [workers'] compensation . . . shall have a lien on the proceeds of any recovery" obtained in a personal injury action by an employee, "whether by judgment, settlement or otherwise." N.Y. Workers' Comp. Law § 29 (1). The amount of the lien is equal to "the total amount of [workers'] compensation awarded . . . and to such extent such recovery shall be deemed for the benefit of" the workers' compensation insurance carrier. *Id*. Thus, when Caban settled his personal injury action in August 2010, a portion of the settlement proceeds was paid to EESISP in full satisfaction of the workers' compensation carrier's lien. Defs. R. 56.1 ¶ 30; Chanzis Decl. ¶ 32; Defs. Ex. N.

Defendants base their argument that Caban's disability pension did not become payable until his workers' compensation payments ceased on Section 4.04 of the PTF Plan. This section explicitly provides that, "[i]n all cases, a Participant who is eligible to receive a Disability Pension shall have the monthly benefit reduced by the monthly amount of the statutory workers' compensation benefits payable to the Participant." Defs. Ex. F at 23.[3] Defendants describe this provision as implementing the determination collectively made by the union and the electrical employers that, "when a worker is injured on the job, the worker should receive only one wage replacement." Defs. Mem. at 21. Because Caban received a workers' compensation benefit greater than the amount of his disability pension from the time of his accident through August

---

[3] This section of the plan was amended in 2010 to read, "In all cases, a Participant who is eligible to receive a Disability Pension shall have the monthly benefit reduced by the monthly amount of the statutory workers' compensation benefits payable to the Participant *whether monthly or credited as part of a personal injury lawsuit or lump sum settlement*." Pl. Ex. NN at 13 (emphasis added). However, this amendment was not applied when calculating Caban's disability pension because his application was submitted before the amendment took effect. Chanzis Decl. ¶ 36; Defs. Mem. at 18-19.

2010, defendants argue that he was not entitled to receive disability pension payments during that time.

Generally, plans that allow for pension offsets based on receipt of workers' compensation benefits do not violate ERISA. *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 516-21 (1981). The Second Circuit considered whether an offset is permitted under ERISA even after a workers' compensation carrier's lien has been repaid in *Connors v. Connecticut Gen. Life Ins. Co.*, 272 F.3d 127 (2d Cir. 2001). The plaintiff in *Connors* sustained an injury while working and was entitled to long-term disability insurance, which was administered by CGLIC on behalf of his employer. The terms of the disability policy provided for deductions in the "'amount of all Other Benefits which [the employee] receive[s.]'" *Connors*, 272 F. 3d at 130. The plan specifically defined "Other Benefits" to "include 'any amounts which [the employee] receive[s] because of disability under . . . any workers' compensation or similar law.'" *Id.* (ellipsis in original). The plaintiff received workers' compensation, and his disability insurance was reduced accordingly. *Id.* After settling a related personal injury action, plaintiff repaid the amount of workers' compensation benefits he had received and argued he was therefore entitled to the money that had been deducted from his disability benefits. *Id.* at 131. The plan administrator rejected this argument.

The Second Circuit reviewed the administrator's decision *de novo* and was "not convinced" that plaintiff was "entitled, under the terms of the Policy, to a return of the funds withheld because he ultimately repaid the amount he received in workers' compensation benefits after settling his personal injury claim." *Id.* at 137. Rather, the court emphasized that unambiguous language in an ERISA plan should be interpreted according to its plain meaning and held,

The Policy allows CGLIC to reduce monthly benefits by amounts received from other sources. *The fact that Connors ultimately repaid his workers' compensation benefits does not change CGLIC's rights under the Policy.* Any other result would presume that additional benefits are due to Connors that were not stated in the insurance policy by the parties to the insurance contract. The District Court was correct in denying Connors's claim for return of the amounts withheld by CGLIC.

*Id.* (emphasis added). Thus, the Second Circuit has upheld a setoff against disability benefits available under an ERISA plan even after the workers' compensation carrier has been repaid if the setoff is consistent with the plain language of the policy.

Although *Connors* involved disability insurance and not a disability pension, its holding is applicable here. Like the policy term at issue in *Connors*, described in the quoted language above, the PTF Plan provides that a participant's disability pension is to be "reduced by the monthly amount of the statutory workers' compensation benefits payable to the Participant." Moreover, like the PTF Plan, the policy in *Connors*, at least insofar as it appears from the opinion, did not explicitly provide that benefits that have been reduced because of workers' compensation may not be restored upon satisfaction of the workers' compensation lien. Nonetheless, the court held in *Connnors* that payment of a workers' compensation lien with settlement proceeds does not avoid the offset for workers' compensation.

Caban attempts to distinguish *Connors* by pointing to differences between the CGLI policy and the PTF Plan. Pl. Mem. at 41-42. Specifically, Caban argues that the personal injury settlement received by the plaintiff in *Connors* was an "Other Benefit" covered by the plan language. As noted above, however, when reciting the pertinent policy's definition of "Other Benefits", the court in *Connors* stated that the term included amounts received under "any workers' compensation or similar law." Later in its opinion, the court reiterated its view that the benefits that justified the offset in *Connors* were those received pursuant to a workers'

compensation award. 272 F.3d at 137. Thus, plaintiff's attempt to distinguish *Connors* is not supported by the language of the court's opinion.

Caban seems to argue that it is somehow unfair for him to be denied disability pension payments based upon workers' compensation benefits he claims to have repaid. In his memorandum, he writes "there was nothing in the summary plan description that stated that if you received a settlement in a third-party law suit, that you would *have to repay it again*." Pl. Mem. at 18 (emphasis added). Although the merits of Caban's claim are dictated by the terms of the PTF pension plan and not by what I conclude is fair, I point out that there is no unfairness in the outcome dictated by the plan language. Rather, Caban's contention that he is being asked to repay the workers' compensation carrier twice is a simplification that distorts the economic reality of what occurred.

As in *Connors*, Caban received funds sufficient to cover his lost wages and his medical bills from a workers' compensation carrier. The economic reality is that it was the tortfeasor, and not Caban, who later repaid the carrier when the case settled. The parties in the personal injury action likely considered, when negotiating their settlement, that the law requires that a workers' compensation lien be satisfied with settlement proceeds. It is therefore reasonable to assume that the defendant in the personal injury action included funds to repay the carrier's statutory lien in the settlement amount it offered. In fact, as indicated in the terms of the agreement reached in the personal injury action, only a portion of the amount that Caban had received in workers' compensation benefits was paid to the insurance carrier. The amount due to the carrier was reduced from the total amount it paid to Caban at least partly to satisfy its "obligation to contribute towards attorney's fees and disbursements for lien reimbursement," an obligation that presumably arose because the carrier was itself a beneficiary of the settlement.

Defs. Ex. N.  Therefore, the settlement amount was paid by the defendant in the personal injury lawsuit on behalf of Caban *and* the workers' compensation insurance carrier.  Indeed, this result is mandated by the relevant statute, which provides that the settlement amount paid is, in part, "deemed for the benefit of" the workers' compensation carrier.  N.Y. Workers' Comp. Law § 29(1).  In other words, the settlement merely shifted the cost of replacing Caban's wages and paying his medical bills from the workers' compensation carrier to the defendant in the personal injury action.  Thus, maintaining the offset did not result in plaintiff repaying his covered wage loss and medical bills twice.

As discussed above, the decisions of the plan administrators are reviewed deferentially, and where a plan administrator and a claimant "offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation must be allowed to control."  *McCauley*, 551 F.3d at 132.  Section 4.04 of the PTF Plan plainly provides that "[i]n all cases, a Participant who is eligible to receive a Disability Pension shall have the monthly benefit reduced by the monthly amount of the statutory workers' compensation benefits payable to the Participant."  Like the policy in *Connors*, the PTF Plan is silent on whether this provision is affected by the workers' compensation carrier's recovery of its lien.  The conclusion of the plan administrators that recovery of the carrier's lien does not affect the reduction in benefits was rational, and therefore should remain in force.

### IV.     *Amount of Plaintiff's Disability Pension*

Defendants contend that the amount of Caban's monthly disability pension was correctly determined to be $490.65.  Defs. Mem. at 1.  This amount was calculated based primarily upon two variables: Caban's "pension credit rate", a function of his rate of pay at the time of his injury, and the number of "pension credits" he had accumulated by that time.  Defs. Mem. at 14-

17. The PTF Plan provides that a pension credit is "a unit of credit earned for time worked for a Contributing Employer that is used in calculating the amount of a participant's pension." PTF Plan § 2.03(a). A participant's pension credits are "multiplied by the appropriate Pension Credit Rate to determine the amount of the benefit under the plan." *Id. See* PTF Plan § 1.17 (defining a participant's "Pension Credit Rate" as "the rate that the Participant's Pension Credits are multiplied by to calculate the amount of the benefit"). The calculations defendants performed to reach the $490.65 monthly pension amount are set forth in Defendants' Exhibit G. Caban contests defendants' determination of his pension credit rate as well as their calculation of the number of pension credits he earned.

### A. Pension Credit Rate: "A" versus "M" Journeyperson

The PTF Plan provides for two pension credit rates. The first, higher rate is applicable to plan participants "who were receiving the 'A' rate of pay and whose Employer was remitting the 'A Contribution Rate'" at the time of separation from employment. PTF Plan § 4.01(d).[4] A lower pension credit rate applies to participants who were receiving "other than the 'A' rate of pay or whose Employer contributes . . . less than the 'A' Contribution rate." PTF Plan § 4.05. This lower pension credit rate is determined according to a formula set forth in the Plan and varies with the participant's hourly rate of pay. *Id.*

Caban acknowledges that, at the time of his injury, he was earning $24.80 per hour, a rate lower than the "A" rate of pay and consistent with the rate for an "M" journeyperson. Defs. R. 56.1 ¶¶ 18-20 and plaintiff's responses thereto; Chanzis Decl. ¶ 22; Defs. Ex. J (excerpt from collective bargaining agreement indicating that the "A" rate effective at the time of Caban's accident was $43.00 per hour and the "M" rate was $24.80 per hour). Defendants have also

---

[4] Other sub-paragraphs of Section 4.01 apply to participants who separated from employment on dates earlier than May 15, 2003, and are thus not applicable to plaintiff.

submitted a copy of Caban's International Brotherhood of Electrical Workers' Local No. 3 Membership Card, which indicates that plaintiff is a member in class "M".  Defs. Ex. K.

Plaintiff apparently contends that, because he had on occasion in the past earned the "A" rate of pay on certain jobs and because he was qualified to do "A" work, his pension should have been calculated based upon the "A" pension credit rate.  Pl. Mem. at 50.  The language of the Plan, though, refers to "Participants who separate from Covered Employment . . . *who were receiving* the 'A' rate of pay."  PTF Plan § 4.01(d) (emphasis added).  The most reasonable reading of this language is that a participant's pension credit rate is determined by his actual rate of pay at the time his employment is terminated.  Here, it is undisputed that plaintiff was earning the "M" rate of pay, an amount less than the "A" pay rate, when he was injured and his employment came to an end.

Moreover, to earn the higher pension credit rate, an employee must be receiving the "A" rate of pay *and* his employer must be remitting contributions at the "A" contribution rate.  PTF Plan § 4.01(d).  Plaintiff points out that he was contributing a higher percentage of his salary as an "M" employee than was required of "A" level employees, and the excerpt of the collective bargaining agreement submitted by defendants corroborates this fact.  Defs. Ex. J, Article II, § 3. Plaintiff argues that his payment of this higher contribution rate satisfies the requirement of Section 4.01(d).  Pl. Response to Defs. R. 56.1 ¶ 19.  The "A Contribution Rate", however, undoubtedly refers to a specific dollar amount and not a percentage of an employee's hourly wage, and plaintiff has not demonstrated that the higher percentage of the lower "M" wage rate results in a larger net amount than the lower percentage of the higher "A" wage rate. Defendants, in contrast, have submitted an affidavit from the Director of Administration for the Joint Industry Board asserting that Caban's employer was remitting a lower contribution amount

to the Board's benefit plans than the "A" contribution rate. Chanzis Decl. ¶ 22.

Evidence that plaintiff occasionally performed work at the "A" rate of pay does not create a genuine question of material fact about his pay rate at the time of his injury. Because it is undisputed that Caban was earning the "M" rate of pay at the time of his accident, it was not arbitrary or capricious to calculate his disability pension amount pursuant to the formula applicable to participants who were not earning the "A" rate of pay at the time of their separation from employment.

### B. Number of Pension Credits

As noted above, "[a] pension credit is a unit of credit earned for time worked for a Contributing Employer." PTF Plan § 2.03(a). At the time relevant to this case, the PTF Plan required that a participant have accumulated at least ten pension credits to be eligible for a disability pension. PTF Plan § 3.05(b); Chanzis Decl. ¶ 8.[5]

Defendants contend that, at the time of his accident, plaintiff had earned ten pension credits under the ESF Plan and six under the PTF Plan. Chanzis Decl. ¶¶ 21-22, 24. Defendants further contend that they applied the terms of a "Reciprocal Agreement" between the ESF and PTF Plans when they calculated Caban's eligibility to receive a disability pension and determined the amount he was entitled to receive. Chanzis Decl. ¶¶ 6, 11, 25-28; Defs. Ex. B. The Reciprocal Agreement provides that

> the pension benefit payable to a retiree shall be based upon the total of the pension benefits actually earned in each Fund based upon the terms and conditions of each Fund for the period of time he was a participant in that Fund, and . . . the amount of the pension paid to the participant will be the total of the pension payable as calculated under the terms and conditions of this [ESF] Fund for the period of time the individual was a participant in this Fund plus the pension payable as calculated under the terms and conditions of the [PTF] Fund.

---

[5] At the time of plaintiff's accident, the ESF Plan required twenty pension credits to qualify for a disability pension. Chanzis Decl. ¶ 7. Plaintiff does not contend that he should have been awarded a disability pension pursuant to the ESF Plan. I therefore do not further discuss the requirements it imposes or benefits it affords.

Defs. Ex. B.  By applying this Reciprocal Agreement, defendants determined that Caban had earned a total of sixteen pension credits (six pursuant to the PTF Plan and ten pursuant to the ESF Plan) and had thus satisfied the ten-credit requirement for a disability pension imposed by the PTF Plan.  Chanzis Decl. ¶ 11.  Having satisfied the ten-credit eligibility requirement, Caban was entitled to a pension amount "based upon the Pension Credit Rate in effect at the time" of his application "multiplied by the greater of (i) 25 Pension Credits, or (ii) the number of Pension Credits accumulated by the applicant."  PTF Plan § 4.04.

Defendants calculated the pension credit rate applicable to Caban at the time of his separation from employment to be $31.50.  Chanzis Decl. ¶ 23.  They did not, however, simply multiply $31.50 by twenty-five pension credits to determine Caban's monthly pension amount, and they offer two reasons to explain why they did not do so.

First, as noted above, defendants determined that ten of Caban's credits were earned pursuant to the ESF Plan, and that Caban last earned ESF Plan credits in 1988.  Chanzis Decl. ¶ 19; Defs. Ex. A.  The ESF Plan states that participants who left their employment in 1988 are entitled to a monthly pension credit of $8.00.  Chanzis Decl. ¶ 20; Defs. Ex. H.  Applying the provision of the Reciprocal Agreement that calls for pension benefits to be calculated based upon the terms and conditions of the fund under which they were earned, defendants applied the pension credit rate of $8.00 to the credits Caban earned under the ESF Plan.  Chanzis Decl. ¶ 20.

Second, defendants did not value each of Caban's PTF Plan credits at $31.50 because the PTF Plan provides for lower pension credit rates after a break in service.  More specifically, and subject to certain exceptions defendants assert are not applicable to Caban, the Plan provides that, when a participant has a break in service, "the Pension Credit Rate applicable to the Pension Credits before the Absence will be the Rate in effect at the commencement of the Absence."

PTF Plan § 4.07(a)(III).  Based on this provision, three of Caban's six PTF Plan credits were valued at less than $31.50 when defendants calculated his monthly pension amount.  Chanzis Decl. ¶ 26; Defs. Ex. G.  Caban's remaining three PTF Plan credits, and the nine additional credits he was awarded to reach a total of twenty-five pursuant to PTF Plan Section 4.04(i), were valued at the $31.50 pension credit rate in place at the time of his accident.

Plaintiff contends that defendants' tally of his pension credits is incomplete and that he earned twenty years, three months, and two weeks of pension credits.  Caban Decl., Docket Entry 43-1, ¶ 12; Pl. Ex. B, Docket Entry 43-6.[6]  As noted above, however, although they determined that Caban had earned sixteen pension credits, defendants calculated Caban's pension benefit on the basis of his having earned twenty-five pension credits pursuant to PTF Plan Section 4.04.  For that reason, the dispute between the parties over whether Caban had in fact earned sixteen or twenty credits by the time of his accident is immaterial.

Also as noted above, defendants applied a lower pension credit rate to three of Caban's PTF Plan credits because they concluded he had a break in service.  According to defendants, two of Caban's PTF credits were earned in 1982 and 1983, when a pension credit rate of $8.50 was in effect.  Chanzis Decl. ¶ 26.  Defendants determined that Caban earned an additional credit in 1998 and attributed a pension credit rate of $22.05 to that credit.  *Id.*  If Caban had additional years of PTF Plan service, he might have been entitled to the higher $31.50 pension credit rate in effect at the time of his accident for all or some of these credits as well.

Caban's accounting of his own work history spans thirty-seven years, from 1968 to 2005, but claims only twenty years and three months of credit.  Pl. Ex. B.  Thus, it is clear that, even by

---

[6] Plaintiff's computations cannot be completely accurate; he contends that he performed covered work for at least *thirteen* months during 2004. Pl. Ex. B (four months in 2004 attributed to J.J. Rosenberg Electrical, three months in 2004 attributed to AMC Electrical, six months in 2004 attributed to DJ Electrical, and five weeks in 2004-2005 attributed to Rockmor Enterprises).

Caban's own reckoning, there were substantial breaks in his service; it appears, for example, that Caban acknowledges he did not perform any covered work from 1984 through 1998. Pl. Ex. B at 2. It is not clear, however, whether Caban contends that defendants erroneously concluded that he had a break in service at a material time and attributed a lower pension credit rate than the one called for in the Plan as a result. Caban has also argued that he received the "A" rate of pay at various times during his employment. Caban Decl. ¶ 58; Pl's Response to Defs. R. 56.1 ¶ 18; Pl. Ex. GG at 11-13. Although the Joint Board properly classified him as receiving the "M" rate of pay at the time he permanently left employment, the valuation of his credits may have been higher if he was receiving the "A" rate of pay directly before a break in service. *See* PTF Plan § 4.07(a)(III) (providing that, under certain circumstances, the pension credit rate applicable to pension credits earned before a break in service is the rate in effect at the time the break in service commenced).

Accordingly, I do not reach defendants' motion for summary judgment with respect to the amount of Caban's monthly pension at this time. Instead, Caban may submit a memorandum of law, as well as affidavits and exhibits, specifically demonstrating that he worked continuously during a period of time material to the determination of one or more relevant pension credit rates, or that he was receiving a rate of pay immediately before his breaks in service that was higher than the rate attributed to him by defendants and which, if applied, would result in a greater pension amount. Plaintiff's submission must include the evidence on which he relies to demonstrate continuous covered employment during the time period involved and an explanation of how, assuming his evidence is believed, the calculation of his monthly disability pension benefit would be affected. If plaintiff intends to pursue this argument, he shall file his submission by May 13, 2014. Defendants may file a responsive submission by May 20, 2014.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted as to the start date of plaintiff's pension and the classification of plaintiff as an "M" journeyperson, and plaintiff's cross-motion for summary judgment is denied. However, I do not reach defendants' motion for summary judgment with respect to the amount of Caban's monthly pension at this time. If plaintiff continues to oppose summary judgment with respect to the amount of his pension, he shall submit a memorandum of law, affidavits and exhibits, all as described above, by May 13, 2014, and defendants may file a responsive submission by May 20, 2014. If plaintiff does not file a submission by May 13, 2014, summary judgment dismissing the case will be entered.

SO ORDERED.


_____
/s/
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
April 28, 2014

U:\CG 2013-2014\Caban 10-CV-00389\Caban final.docx